# EXHIBIT 2

**AFFIDAVIT OF GEORGE C. BOYLES**

STATE OF WEST VIRGINIA,

COUNTY OF MARION, TO-WIT:

I, George C. Boyles, being first duly sworn upon my oath, depose and state as follows:

**I. BACKGROUND AND BASIS OF KNOWLEDGE**

1. I am over the age of eighteen years, am competent to testify, and make this Affidavit upon my own personal knowledge.

2. I reside at 106 Bonanza Lane, Fairmont, Marion County, West Virginia.

3. I served as an elected member of the Marion County Board of Education (the "Board") from July 1, 2022 through June 30, 2026.

4. I served as President of the Board for the final two years of my term.

5. I did not seek re-election, for personal reasons relating to my family and my health, and my service ended upon the expiration of my term on June 30, 2026.

6. I provide this Affidavit voluntarily and upon my own initiative; I have not been subpoenaed, I have received no payment or thing of value, and I have been promised nothing in exchange for this Affidavit.

7. Except where I expressly state another basis, everything stated in this Affidavit is drawn from my own firsthand observation of and participation in the events described, and nothing stated herein discloses or relies upon any communication between the Board and its legal counsel.

8. During my service on the Board, I served alongside Board members Donna Costello, Kevin Rogers, James Saunders, and Thomas Dragich, and I worked directly with Dr. Donna Heston in her capacity as Superintendent of Marion County Schools.

## II. DR. HESTON'S PERFORMANCE AS SUPERINTENDENT

9. As Board President, I was the Board's principal point of contact with the Superintendent, and I functioned as the go-between between the Superintendent and the Board.

10. In my observation, Dr. Heston knows the law, knows what needs to be done, and gets things done within the time they need to be done.

11. In all school systems, various tasks carry deadlines that must be timely met, and Dr. Heston always met those deadlines.

12. Dr. Heston answered almost every question I put to her as a Board member, and when there were differences of opinion, we would obtain the information, discuss it, find solutions, and implement those solutions if the Board approved the recommendation.

13. Under Dr. Heston's leadership, the district restored and expanded its career and technical education programming so that every school had a CTE focus, offering students an array of career pathways to supplement their education.

14. Under Dr. Heston's leadership, the district obtained School Building Authority funding and applied it to school-safety improvements, an initiative that was my own highest priority as a Board member.

15. In or about February 2026, pursuant to the evaluation instrument the Board itself had developed the preceding August and September, the Board evaluated Dr. Heston's performance across categories including student advancement, community engagement, district operations, and learning environment.

16. On that evaluation, Dr. Heston received "exceeds expectations" in two categories and "meets expectations" in the remaining three, and she received no rating requiring an action plan in any category.

17. When I met with Dr. Heston concerning the evaluation, she presented documentation addressing every evaluation item in depth, reflecting what had been accomplished in each area.

18. Based on my own observation of her performance, I would have rated Dr. Heston as exceeding expectations in three or four of the five categories.

19. At no time did I ever take the position that the Board should not rehire Dr. Heston; to the contrary, I recommended a multi-year contract for her.

## III. THE CAMPAIGN TO REMOVE DR. HESTON BEGAN WITH PHOTOGRAPHS AND HER PURPORTED SEXUAL ORIENTATION — NOT HER PERFORMANCE

20. In or about May 2024, photographs of Dr. Heston were brought before the members of the Board.

21. While I do not specifically recall whether it occurred in or outside of an executive session, the photographs were raised by Ms. Costello to the rest of the Board.

22. The photographs were characterized in that discussion as depicting the "lifestyle" of Dr. Heston.

23. Based on that discussion, I understood the references to Dr. Heston's "lifestyle" to mean her purported sexual orientation — specifically, the claim that she is a lesbian and was in a same-sex relationship.

24. I had myself received certain of these photographs anonymously by mail; they simply showed up, and I do not know who sent them.

25. When the photographs were raised, it was then stated, in words or substance, that "we need to get rid of her," referring to Dr. Heston.

26. The removal of Dr. Heston was thus proposed in direct connection with her purported sexual orientation.

27. I stated to the other Board members that the Board could not fire Dr. Heston for that reason, because she would be in a protected class.

28. There was never any suggestion of misconduct involving any student; the claims were always rumors from persons in the community.

29. The discussion then progressed to an assertion that Dr. Heston was having an affair with Ms. Kristin DeVaul.

30. I voiced my displeasure with the other Board members' attempting to take discriminatory action against Dr. Heston.

31. I told Ms. Costello and the others that I did not think it was the right thing to do.

32. It was Ms. Costello, Mr. Rogers, and Mr. Saunders — not Mr. Dragich, and not I — who treated the photographs as indicative of a purported same-sex relationship between Dr. Heston and Ms. DeVaul.

33. No performance-based reason for removing Dr. Heston was voiced in that discussion; the sole stated basis for wanting to remove her was her purported sexual orientation and her purported relationship with Ms. DeVaul.

## IV. THE NORTH MARION HIGH SCHOOL MEETING AND THE THREE MEMBERS WHO PURSUED THE ACCUSATIONS

34. Some months later, Ms. Costello planned to meet with a subordinate school employee at North Marion High School.

35. I understood that the subject Ms. Costello intended to pursue at that meeting was the same set of accusations concerning Dr. Heston and Ms. DeVaul.

36. Ms. Costello did not ask me to go to that meeting; she knew that I would not be a part of it.

37. In the days before the meeting, Ms. Costello asked Board member Kevin Rogers to go with her.

38. A couple of days after the meeting, I learned that Mr. Rogers had in fact gone with Ms. Costello.

39. I understand that the meeting at North Marion High School did in fact take place.

40. I understand that a recording of that meeting exists, and that the recording is approximately seventy-seven minutes in length.

41. I have never listened to that recording, and I did not want to listen to it.

42. I became aware of the recording at the time because others had obtained it, and its existence became known to the Board members.

43. Board member James Saunders, who then served as my Vice President, was also involved with Ms. Costello and Mr. Rogers concerning Dr. Heston.

44. Mr. Saunders talked to me concerning Dr. Heston during that period.

45. Based on my own dealings with Mr. Saunders, it is my understanding that Mr. Saunders was already in agreement with Ms. Costello and Mr. Rogers concerning Dr. Heston by the time of the North Marion meeting.

46. From that period forward, it was Ms. Costello, Mr. Rogers, and Mr. Saunders who drove the accusations concerning Dr. Heston and Ms. DeVaul, and the accusations perpetuated from there.

47. Ms. Costello, Mr. Rogers, and Mr. Saunders knew that I was not going to be a part of those discussions, and they proceeded on their own.

48. Board member Thomas Dragich, like me, refused to entertain those discussions.

## V. THE CONFINEMENT OF MS. DEVAUL AND DR. HESTON'S OBJECTION

49. In or about August 2025, I was present in an executive session of the Board, concerning Ms. DeVaul, at which it was directed that Ms. DeVaul was not to leave her office.

50. In my observation, that directive came from Mr. Saunders.

51. Neither I nor Mr. Dragich ever conveyed or supported any such restriction, and no such restriction was mine.

52. A directive of that kind, delivered by an individual Board member concerning a county employee's day-to-day movements, was not in my view a proper exercise of any Board member's role.

53. Dr. Heston, in my presence and in that setting, confronted Mr. Saunders about the restriction on Ms. DeVaul, in substance objecting that he was discriminating against her.

54. Mr. Saunders made no response to Dr. Heston's objection at that meeting; my impression was that he realized he was treading on something that might not be right.

55. In or about December 2025, issue was again taken, this time with the fact that Ms. DeVaul had attended a professional conference in Wheeling that Dr. Heston also attended.

56. It was suggested that Ms. DeVaul was "going on trips" with Dr. Heston, when my understanding was that the conference was for personnel who report to the Superintendent and that Ms. DeVaul attended at the Superintendent's direction.

57. The attendance of the two women at that conference was portrayed in terms of the rumored relationship between them — that Ms. DeVaul was, in substance, running off with her girlfriend — rather than in terms of their job duties.

58. In my observation, the restrictions directed at Ms. DeVaul arose from the rumored relationship between Ms. DeVaul and Dr. Heston, and not from any concern with the job performance of either woman.

59. During my service, male administrators of the district regularly traveled to and attended meetings and conferences together, and I am aware of no occasion on which any Board member took issue with male administrators doing so, or directed that any male employee remain in his office.

60. The scrutiny applied to Ms. DeVaul and Dr. Heston traveling together was applied to no one else.

## VI. NO LEGITIMATE REASON WAS EVER GIVEN

61. The only reason Ms. Costello ever articulated to me for opposing Dr. Heston was that she was receiving complaints from "my people" in the northern end of the county that Dr. Heston was not doing enough for that part of the county, and that it had been that way for a number of years.

62. I called Ms. Costello out on that statement at a meeting, telling her, in words or substance, that she was put on this Board to represent all the people of the county.

63. In my observation, Ms. Costello's claim about "her people" perpetuated old grievances and was not a legitimate, performance-based reason to remove Dr. Heston.

64. No member of the Board ever articulated to me any legitimate, performance-based reason for declining to renew Dr. Heston's contract.

65. To the contrary, Mr. Saunders himself told me that Dr. Heston is smart, that she is the best at receiving complaints and doing what needs to be done, and, in words or substance, that she is "the best of any superintendent I've worked with."

66. Mr. Saunders pursued the accusations against Dr. Heston even though, by his own words to me, she was the best superintendent he had worked with.

67. Ms. DeVaul was the best-qualified candidate for the position she holds.

68. In my observation, Dr. Heston based personnel recommendations on who was best for the job, not on who a candidate was connected to.

69. In my observation, the effort to remove Dr. Heston and to restrict Ms. DeVaul was never about the job performance of either woman; it was because of the purported same-sex relationship between Dr. Heston and Ms. DeVaul that Ms. Costello, Mr. Rogers, and Mr. Saunders believed existed.

## VII. THE NON-RENEWAL AND THE MARCH 2026 VOTES

70. Following the February 2026 evaluation, I advised the Board that a superintendent had to be in place by July 1, and I placed the question of Dr. Heston's contract before the Board.

71. I proposed a four-year contract for Dr. Heston, and, when the members would not support it, a three-year and then shorter terms; at no point did I take the position that Dr. Heston should not be renewed.

72. The three members who would not support the multi-year renewal I recommended — Ms. Costello, Mr. Rogers, and Mr. Saunders — were the same three members who had pursued the accusations concerning Dr. Heston's purported sexual orientation.

73. In my observation, their refusal to renew Dr. Heston's contract was the carrying out of what had been stated beginning in 2024 — that they were going to get rid of her.

74. On or about March 3, 2026, Dr. Heston provided the Board a document titled "Superintendent Marion County Schools 2025–2026 Evaluation Goals," presented by Dr. Heston.

75. Ms. Costello flipped through that document briefly and then stated, in words or substance, that she "has another thing to use as a doorstop."

76. At the Board's March 5, 2026 meeting, when I called for the vote on Dr. Heston's contract, Ms. Costello stated, in words or substance: "I'm not going to vote for her."

77. Ms. Costello offered no reason concerning Dr. Heston's performance.

78. Ms. Costello frequently invoked the phrase "vote your conscience" in Board matters, and as to Dr. Heston's contract she stated, in words or substance, that her conscience could not vote for her.

79. Her stated obstacle was her conscience; she cited nothing about the performance of the superintendent the Board had favorably evaluated only weeks earlier.

80. I took Ms. Costello's statements, together with her treatment of the evaluation-goals document, to mean that her mind was made up and that nothing about Dr. Heston's actual performance was going to change it.

81. Mr. Rogers stated, in words or substance: "I'm not going to vote for her; I can't vote for her."

82. Mr. Rogers likewise offered no reason concerning Dr. Heston's performance.

83. Mr. Saunders subsequently stated, in words or substance, that he would change his vote to affirmative if Dr. Heston would agree to certain conditions, and that the Board would give her a one-year contract.

84. At the Board's direction I asked Dr. Heston whether she would accept a one-year contract, and she told me she would, because she likes this county and wanted to finish the work she had begun.

85. I reported to the Board that Dr. Heston had agreed, and I stated to the Board, in words or substance, that a one-year term was not what she was entitled to.

86. The one-year contract was approved at the March 5, 2026 meeting on a three-to-two vote.

87. Upon information and belief, at the time of the March 2026 votes the Board had learned that Dr. Heston and Ms. DeVaul were asserting legal claims against the Board and certain of its members.

## VIII. THE HOSTILITY ESCALATED AFTER THE CLAIMS WERE ASSERTED

88. After the Board learned that Dr. Heston and Ms. DeVaul were asserting legal claims, the hostility of Ms. Costello, Mr. Rogers, and Mr. Saunders toward Dr. Heston increased.

89. In my observation, the conduct of these members during this period was retaliatory.

90. In an effort to let tensions cool, I arranged the Board's schedule so that no meeting was held for three weeks, while still meeting all applicable requirements; I did not announce my reason to the members.

91. The situation did not improve; in fact, it got worse.

92. As one example, after these events Ms. Costello challenged a roof-replacement project at a county high school that Dr. Heston had researched and recommended through the district's ordinary process, suggesting something was wrong with the project.

93. In the period surrounding the West Virginia Department of Education Office of Accountability's review of the district, Ms. Costello and Mr. Rogers submitted extensive records demands, including demands for the salary information of district personnel.

94. In my observation, Ms. Costello also went out to persons in the county with whom she has relationships and solicited negative comments concerning Dr. Heston in advance of the Office of Accountability's review.

95. In my observation, Ms. Costello and Mr. Rogers were attempting to pick and choose things that could be used to portray Dr. Heston negatively — to build a case against her after the fact.

96. On one occasion, I provided salary information to the four other Board members, and before I arrived home that information was out in public.

97. I believe that Ms. Costello is the one who made that information public.

98. In the meetings of this period, in my observation, Ms. Costello, Mr. Rogers, and Mr. Saunders were grasping at straws to find something wrong with Dr. Heston.

99. The atmosphere of this period was a substantial reason I was glad to be leaving the Board; it seemed to me that these members did not want to do anything other than try to get rid of her.

## IX. EFFORTS TO PRESELECT A REPLACEMENT AND THE BOARD'S REORGANIZATION

100. After I announced in January 2026 that I would not seek re-election, Mr. Saunders and Ms. Costello sought to determine who the next superintendent would be.

101. Mr. Saunders asked Ms. Costello to talk to a male county administrator about whether, if offered the superintendent's contract, he would take it.

102. Based on that conversation between Mr. Saunders and Ms. Costello, it was decided that Ms. Costello would approach the administrator.

103. Ms. Costello made that approach to the administrator.

104. I know of these events because Mr. Saunders himself told me of them.

105. Neither Mr. Saunders nor Ms. Costello asked me to speak to the administrator, and I never spoke to the administrator about the matter.

106. I considered what they were doing totally inappropriate; a candidate submits his name along with anybody else, and the Board picks the best candidate.

107. As to the events of the Board's reorganization described below, I watched that meeting, and I was further informed of those events by a sitting member of the Board.

108. In connection with the Board presidency, Mr. Saunders told Ms. Costello, in words or substance, "you don't have the votes" and "I've got the votes."

109. At the Board's first reorganization meeting after my term ended, Mr. Saunders accepted the nomination as President and announced that he would do something a little different and appoint two vice presidents.

110. In my four years on the Board, and to my knowledge, the appointment of two vice presidents was unprecedented.

## X. RECENT CONTACTS BY MR. SAUNDERS

111. In the week preceding the execution of this Affidavit, Mr. Saunders approached me on three separate occasions concerning the restriction on Ms. DeVaul.

112. On those occasions, Mr. Saunders characterized the restriction as a suggestion that Ms. DeVaul stay in the office, rather than a demand that she do so.

113. To the best of my recollection, however, what was delivered in executive session concerning Ms. DeVaul was not a suggestion; it was a directive.

## XI. DR. HESTON'S CONTINUED PERFORMANCE

114. Throughout the events described above, and through the summer of 2026, Dr. Heston continued to perform her duties, including roof replacements, school-safety work,

credit-recovery programming, and holding training sessions for county principals during the summer, all of which continue and are performing better than the year before.

115. I spoke with Dr. Heston regularly during the last year of my term; she told me that some days were tough, but that she was there for the kids and wanted to get things done.

116. In every dealing I had with her, Dr. Heston was professional, and she did the things the Board set out for her to do, and did them well.

**FURTHER AFFIANT SAYETH NAUGHT.**

George C. Boyles
GEORGE C. BOYLES

Taken, subscribed, and sworn to before me this 13th day of August, 2026.

My commission expires: Sept 8 2026

NOTARY PUBLIC

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
AMANDA M CARGILL
Umina Legal, PLLC
125 Greenbag Road, Morgantown West Virginia 26501
My Commission Expires September 8, 2026